UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

TOD S. CAGAN,

                      Plaintiff,             **MEMORANDUM & ORDER**
                                               22-CV-00260(EK)(LGD)

          -against-

NEW YORK CITY POLICE OFFICER
GREGORY RITTENHOUSE, et al.,

                     Defendants.

------------------------------------x

ERIC KOMITEE, United States District Judge:

        Tod Cagan was arrested and prosecuted in Nassau County for allegedly assaulting Gregory Rittenhouse, an officer of the New York Police Department.  Rittenhouse pressed state criminal charges against Cagan, alleging Cagan tricked him into vaping marijuana.

        Cagan denies that he assaulted anyone.  The complaint alleges that his assault prosecution was adjourned in contemplation of dismissal under N.Y. Crim. Proc. Law § 170.55(2).  Under that procedure, following a probationary period, Cagan's charges would be "deemed to have been dismissed."

        Cagan now sues various defendants under 42 U.S.C. § 1983, alleging that Rittenhouse's charges, and his attendant arrest and prosecution, were part of a cover-up to protect

Rittenhouse from being fired for a positive drug test.
Rittenhouse, his fellow NYPD officer Michael Philbin, and the
City of New York have moved to dismiss in part.  Except for the
"John Doe" defendants allegedly employed by Nassau County, the
other defendants have all appeared.

Rittenhouse and Philbin both move to dismiss Cagan's
Section 1983 claims for false arrest and malicious prosecution.
The City moves to dismiss all claims against it.  For the
reasons that follow, the motions are granted.

## I.   Background

The following factual background is taken from Cagan's
amended complaint, ECF No. 32, and assumed to be true for
purposes of this motion.

Cagan lives across the street from defendant Philbin,
an NYPD officer, in the Village of Freeport in Nassau County.
Am. Compl. ¶ 36.  One night in June of 2018, Cagan gave Philbin
a ride by boat to the Nautical Mile area of Freeport.  *Id.* ¶ 38.
Cagan and Philbin proceeded to separate destinations there.  But
hours later, Philbin and his friend, defendant Rittenhouse,
asked Cagan for a ride back.  *Id.* ¶ 43.

Cagan obliged.  Some time after the three men arrived
at Cagan's house, Rittenhouse entered the bathroom.  *Id.* ¶ 45.
After Rittenhouse exited the bathroom, Cagan noticed vomit and
urine "all over his bathroom."  *Id.* ¶ 47.

After cleaning his bathroom, Cagan met Rittenhouse and Philbin in his kitchen. *Id.* ¶¶ 47–48. Rittenhouse asked Cagan about a vaporizer pen on Cagan's kitchen table. *Id.* ¶ 49. He asked, "what's in the vape pen?" *Id.* Cagan responded, "It's CBD" — cannabidiol, a marijuana extract. *Id.*

CBD's legality has evolved since June 2018. Nevertheless, as explained below, it was quite likely, if not certain, that possession of a CBD vaporizer was a crime at that time — under both federal and state law.

Following this conversation, Philbin and Rittenhouse left Cagan's home and contacted Philbin's friend, a Village of Freeport Police Officer named Michael Geniale, who met Philbin and Rittenhouse outside of Philbin's home. *Id.* ¶ 51. They told Geniale that Rittenhouse "was at a bar" in Freeport and had "inhaled a puff of a vape pen that belonged to a stranger." *Id.* ¶ 52. After speaking with a sergeant, Geniale instructed Rittenhouse and Philbin to call 911, request an ambulance, and go to the hospital. *Id.* ¶ 53.[1]

Rittenhouse and Philbin then called 911. *Id.* ¶ 55. Another VFPD Officer arrived, and, per a police report, Rittenhouse and Philbin reiterated that Rittenhouse "was at a bar and inhaled a puff of a Vaporizer pen that belonged to a

---

[1] Cagan does not allege a basis for knowing precisely what was said in this conversation, although he states that his entire complaint is alleged "upon information and belief." Am. Compl. 1.

stranger." *Id.* ¶ 56.  Rittenhouse went to the hospital and tested positive for THC.  *Id.* ¶ 57.

Later that day, Rittenhouse pressed state criminal assault charges against Cagan.  *See id.* ¶ 60.  In statements to the Freeport Police Department, Rittenhouse and Philbin both claimed that Rittenhouse was deceived by Cagan, into inhaling while at Cagan's home — not a bar.  *See id.* ¶¶ 62-63.  They reported that Cagan said the vaporizer contained "just tobacco," but then subsequently revealed that it contained "medical marijuana."  *Id.*

On June 17, 2018 — the day after Rittenhouse's positive THC test — Geniale and other VFPD officers arrested Cagan at his home.  *Id.* ¶ 64.  He was detained overnight and arraigned the next day, when he was charged with felony assault and released on his own recognizance.  *Id.* ¶¶ 66-67.

Some six months later, Cagan accepted an adjournment in contemplation of dismissal (ACD) of his state criminal case. *Id.* ¶¶ 30, 77.  The complaint alleges that Cagan "is presently seeking to have his ACD disposition vacated and, thereafter, have the charges dismissed."  *Id.* ¶ 30.

## II.  Legal Standards

At the pleading stage, "all well-pleaded, nonconclusory factual allegations in the complaint" are assumed

to be true.  *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

To survive a motion to dismiss on Rule 12(b)(6) grounds, the complaint must plead sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011).[2]  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III. Discussion

**A.   Rittenhouse's and Philbin's Motions to Dismiss**

Rittenhouse and Philbin move to dismiss the false arrest and malicious prosecution Section 1983 claims against them.

  1.   <u>False Arrest</u>

A Section 1983 false arrest claim requires the plaintiff to plead that: (1) the defendant acted under color of

---

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

state law; (2) the defendant "intended to confine him"; (3) the plaintiff was conscious of the confinement; (4) the plaintiff did not consent to the confinement; and (5) the confinement was not otherwise privileged. *Posr v. Doherty*, 944 F.2d 91, 96–97 (2d Cir. 1991). Only two of these elements are in dispute: first, whether Philbin and Rittenhouse acted under color of state law; and second, whether that confinement "was privileged, that is, whether the [defendants] had probable cause to arrest" Cagan. *Guan v. City of N.Y.*, 37 F.4th 797, 804, 807 (2d Cir. 2022).

"Under 'color' of law means under 'pretense' of law" and "acts of officers in the ambit of their personal pursuits are plainly excluded." *Pitchell v. Callan*, 13 F.3d 545, 547–48 (2d Cir. 1994) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)). Thus, "personal pursuits [by] police officers do not give rise to section 1983 liability." *Id.* at 548. Nevertheless, "liability may be found where a police officer, albeit off-duty, nonetheless invokes the real or apparent power of the police department." *Id.*

"To the extent that . . . defendants are subject to the obligations imposed on state actors, they also share the immunities the law extends to those actors." *Fabrikant v. French*, 691 F.3d 193, 211 (2d Cir. 2012). Thus, to the extent that state action is implicated, the defense of qualified

immunity "shields law enforcement officers from § 1983 claims
for money damages provided that their conduct does not violate
clearly established constitutional rights of which a reasonable
person would have been aware." *Figueroa v. Mazza*, 825 F.3d 89,
99 (2d Cir. 2016).

   "In the context of § 1983 actions predicated on
allegations of false arrest, . . . an arresting officer is
entitled to qualified immunity so long as 'arguable probable
cause' was present when the arrest was made." *Id.* at 100.  A
police officer has arguable probable cause "if either (a) it was
objectively reasonable for the officer to believe that probable
cause existed, or (b) officers of reasonable competence could
disagree on whether the probable cause test was met." *Id.*  "Put
another way, an arresting officer will find protection under the
defense of qualified immunity unless no reasonably competent
officer could have concluded, based on the facts known at the
time of arrest, that probable cause existed." *Id.*

   At the pleading stage, to prevail on a qualified
immunity defense, a defendant "must show that, construing all
reasonable inferences in the plaintiff's favor, the facts
supporting the immunity defense appear on the face of the
complaint" and "the plaintiff can prove no set of facts . . .
that would entitle him to relief." *Kass v. City of N.Y.*, 864
F.3d 200, 206 (2d Cir. 2017).  "Qualified immunity is

appropriately granted on a Rule 12(b)(6) motion only if it is based on facts appearing on the face of the complaint, exhibits to the complaint, documents incorporated by reference, and items of which judicial notice may be taken." *Biswas v. Kwait*, 576 F. App'x 58, 59 (2d Cir. 2014), *as amended* (Aug. 28, 2014).

As set forth below, Cagan's Section 1983 false arrest claim (a) fails adequately to allege that Philbin and Rittenhouse were acting under color of law and (b) does plead facts consistent with arguable probable cause.

a.   Cagan Fails to Allege that Rittenhouse and Philbin Acted Under Color of State Law

Action under color of state law requires that the defendant exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988).

Based on the complaint, by contrast, Rittenhouse and Philbin acted as private individuals.  They "contact[ed] the police to report that [Rittenhouse] ha[d] been the victim of an assault," just "as any individual may." *Rodriguez v. N.Y.C. Transit Auth.*, No. 06-CV-13762, 2009 WL 3817298, at *5 (S.D.N.Y. Nov. 10, 2009).  And "neither speaking to, nor filing a report with, the police constitutes a public function — i.e. a function that is 'traditionally the exclusive prerogative of the State.'"

*Capogrosso v. Gelbstein*, No. 18-CV-2710, 2022 WL 4550812, at *2
(E.D.N.Y. Sept. 29, 2022) (quoting *Rendell-Baker v. Kohn*, 457
U.S. 830, 842 (1982)), *aff'd*, No. 22-2827, 2023 WL 7485363 (2d
Cir. Nov. 13, 2023).[3]

Actions that are not "taken pursuant to [the
official's] role and authority" are "not performed under color
of state law." *Brady v. Grant*, 225 F.3d 645, 2000 WL 1160707,
at *3 (2d Cir. 2000) (table).  A line of cases in this circuit
have applied this rule where a government employee was
responsible for a plaintiff's arrest by others.  These cases do
not turn on "a simple determination as to whether [the employee]
was on or off duty," *Pitchell*, 13 F.3d at 548, but instead ask
instead whether the employee exercised "power possessed by
virtue of" being "clothed with the authority of state law."
*West*, 487 U.S. at 49.

For example, in *Brady*, the Second Circuit held that
a government employee who was "on duty" nevertheless engendered
the plaintiff's arrest without exercising his own state power.
2000 WL 1160707, at *3.  In that case, a town supervisor, who
worked privately as an insurance agent, obtained a temporary

---

[3] *See also Pitchell*, 13 F.3d at 548.  In *Pitchell*, the Second Circuit
cited with approval the Third Circuit's conclusion that a police inspector
had not acted under color of law when he signed a complaint for arrest of the
plaintiff, who had placed obscene telephone calls to the inspector's home.
*Id.* (citing *Perkins v. Rich*, 204 F. Supp. 98 (D. Del. 1962), *aff'd on opinion
below*, 316 F.2d 236 (3d Cir. 1963)).

restraining order against the plaintiff, who had harassed the supervisor while he was selling insurance. *Id.* at *1. When the plaintiff later appeared at a town board meeting where the supervisor was presiding, the supervisor "threatened to call the police to enforce the TRO unless [the plaintiff] left." *Id.* The plaintiff refused to leave, and a deputy sheriff ultimately arrested him for violating the TRO. *Id.*

The Second Circuit held, on appeal of judgment issued at the summary judgment stage, that the defendant had not acted in his role as town supervisor when he invoked the TRO. *Id.* at *3. That TRO protected him as a private citizen. *Id.* "Any person at the meeting who was protected by a facially valid TRO could have enforced it and caused the arrest of the person who violated it," without herself wielding any state authority. *Id.* The supervisor thus had not acted under color of state law and could not be liable under Section 1983 for the plaintiff's purportedly unconstitutional arrest or prosecution. *Id.*

A district court reached a similar conclusion in *Rodriguez*, where a subway conductor reported his on-duty assault. *See* 2009 WL 3817298, at *5. The alleged assailant sued the conductor under Section 1983 for false arrest and malicious prosecution. *See id.* at *2. The district court, following *Brady*, granted the conductor summary judgment. *Id.* at *4. The court held that the conductor did not wield state power

by calling the police on his assailant — rather, "any individual may contact the police to report that he or she has been the victim of an assault; one need not be employed by the [city transit authority] to do so." *Id.* at *5.

In *McAuliffe v. Pomposello*, a district court denied an off-duty police officer's motion for summary judgment because genuine questions of fact remained as to whether the officer wielded state power. *See* No. 10-CV-8721, 2011 WL 4633867, at *2 (S.D.N.Y. Oct. 4, 2011). Like *Rodriguez*, *McAuliffe* concerned a government employee's calling police to a train to arrest the plaintiff. *See id.* at *2. But unlike in *Rodriguez*, the *McAuliffe* defendant was a police officer, not a train conductor; he called his on-duty colleagues to his aid. *See id.* Moreover, to allow his colleagues to board at a particular station, he put his foot in the door of the commuter train he was riding and held the train for several minutes, *id.* at *2 — an action outside the legal repertoire of civilian passengers. Furthermore, a reasonable jury could have found from the plaintiff's testimony that the defendant "directed his fellow officers to arrest [the plaintiff] and remove her from the train." *Id.* at *4.

The allegations here are inconsistent with state action. Philbin and Rittenhouse — NYPD officers — are alleged to have called Philbin's friend, a member of Freeport's local

police force.  *See* Am. Compl. ¶ 51.  Eventually, Philbin and
Rittenhouse called 911, and another Freeport police officer
responded to the scene.  *Id.* ¶ 55.  Rittenhouse chose to press
charges, and Rittenhouse and Philbin then gave statements to the
VFPD asserting that Cagan had assaulted Rittenhouse.  *See id.*
¶¶ 60, 62–63.  The complaint does not allege that Rittenhouse
pressed charges through channels unavailable to private
citizens.  A day after the incident, Officer Geniale and other
local officers arrested Cagan; neither Philbin nor Rittenhouse
is alleged to have been present.  *Id.* ¶ 63.

These allegations do not plausibly suggest that
Philbin and Rittenhouse were able to effectuate Cagan's
detention because they were off-duty NYPD officers.  Rather, at
most, Cagan alleges that Philbin and Rittenhouse could do so
because they had a friend who was an on-duty VFPD officer.
Unlike in *McAuliffe*, Philbin and Rittenhouse are not alleged to
have summoned their own on-duty colleagues, directed anyone to
arrest Cagan, or to have taken any actions that might have been
impermissible for a civilian, like holding a train on its route.

Importantly, whatever informal clout the NYPD officers
may have carried with their counterparts in the VFPD is
irrelevant.  It is "erroneous[]" to base the color of law
analysis on the "subjective reaction to [the off-duty officer's]
conduct rather than the nature of [his] activity."  *Pitchell*, 13

F.3d at 548-49.  Thus in *Rodriguez*, the district court rejected the argument that the train conductor defendant had acted under color of state law because "his report of a crime carried more weight than a report by a private citizen would."  2009 WL 3817298, at *5.  Judge Sullivan held that the defendant's conduct "may not be deemed to have been under color of state law merely because [a police officer] chose to place great weight on [his] allegations."  *Rodriguez*, 2009 WL 3817298, at *5.[4]

And where "a police officer exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not jointly engaged in the officer's conduct so as to render it a state actor under Section 1983."  *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999).  Here, Cagan does not sufficiently allege that any VFPD officer failed to exercise independent judgment because Philbin and Rittenhouse were NYPD officers.

The complaint also fails to state a claim based on Philbin's or Rittenhouse's "conspiring" with state actors.  A plaintiff may state a Section 1983 conspiracy claim by plausibly

---

[4] This reading of *Pitchell* and *Rodriguez* is critical to the conclusion here, as the complaint would  support the inference that Rittenhouse and Philbin's reports "carried more weight" with the VFPD.  Among other things, Cagan has alleged that the VFPD pursued charges despite the reporting officers' stories having changed as to who provided the vaporizer (a stranger at a bar, versus Cagan — Philbin's neighbor) and where Rittenhouse inhaled from it (at a bar at the Nautical Mile, versus at Cagan's home).

alleging "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002). But "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." *Id.* at 325. Cagan's complaint is general and conclusory on this point. He alleges that all the "Defendants conspired" to "protect Defendant Rittenhouse's employment," and that Rittenhouse "used his status" as an NYPD officer "in order to fabricate" the charges against Cagan. *Id.* ¶ 58. The only factual allegation suggestive of a conspiracy is that certain VFPD officers knew that Rittenhouse claimed to have inhaled from a vaporizer pen at a bar, rather than at Cagan's house. *See* Am. Compl. ¶¶ 52, 56. But inferring conspiracy from these limited allegations would be too "speculative." *Arar v. Ashcroft*, 585 F.3d 559, 569 (2d Cir. 2009) (dismissing civil rights conspiracy claim for insufficient factual content).

Because Rittenhouse and Philbin were not engaged in state action when they effectuated Cagan's detention, their motion to dismiss the Section 1983 false arrest claim is granted.

      b.   On the Face of the Complaint, Qualified Immunity
           Shields Rittenhouse and Philbin from the False
           Arrest Claim

Even if they had engaged in state action, Rittenhouse
and Philbin would be shielded from the Section 1983 false arrest
claim by qualified immunity, as it is apparent on the face of
the complaint that they had at least arguable probable cause to
arrest Cagan.  "An officer is entitled to qualified immunity
from a federal false arrest and imprisonment claim if he had
arguable probable cause to arrest the plaintiff for any offense,
regardless of the offense with which the plaintiff was actually
charged."  *Kass*, 864 F.3d at 206.

Here, by Cagan's own allegations, he confessed to
possessing CBD shortly before he was arrested.  *See* Am. Compl.
¶ 49.  In June of 2018, both New York and federal law deemed CBD
to be "marihuana" – "a Schedule I controlled substance" that
"was therefore unlawful to possess." *Linder v. Six Flags Ent.
Corp.*, No. 18-CV-9954, 2019 WL 13240608, at *3 (C.D. Cal. May
31, 2019) (discussing federal law); *accord* N.Y. Pub. Health Law
§ 3306 (McKinney 2017) (amended July 11, 2018) (New York law).
*Compare* 21 U.S.C.A. § 802(16) (West 2017) (amended October 24,
2018) (federal marijuana definition), *with* N.Y. Pub. Health Law
§ 3302(21) (McKinney 2017) (amended March 8, 2020) (materially
identical New York definition).  Congress first narrowed the
federal definition of marijuana to exclude CBD in December of

15

that year.  *See* Agricultural Improvement Act of 2018, Pub. L.
115-334, § 10113, 132 Stat. 4490, 4908 (2018); *see also, e.g.*,
*Linder*, 2019 WL 13240608, at *3 n.2.  And New York followed suit
in 2020.  N.Y. Pub. Health Law § 3302(21) (McKinney 2020)
(amended March 31, 2021).

Cagan contends that, even in June of 2018, not *all* CBD
met the legal definition of marijuana.  *See* Pl.'s Letter 1, ECF
No. 82.  He acknowledges contemporaneous guidance from the U.S.
Department of Justice that it was "not practical" to legally
obtain "more than trace amounts of" CBD, but he argues that it
may nevertheless have been possible.  *See id.* (citing U.S. Dept.
of J., Drug Enf. Admin., *Clarification of the New Drug Code
(7350) for Marijuana Extract* ("DOJ Clarification")).[5]  Per that
DOJ guidance, "trace amounts" of CBD may be found in parts of
the cannabis plant that are excluded from the definition of
marijuana.  *See* DOJ Clarification.

Given this state of the law, Rittenhouse and Philbin
had at least arguable probable cause to arrest Cagan.  Cagan
confessed to possession of a vaporizer pen's worth of a
substance that it was "not practical" to legally obtain in bulk.
The Second Circuit has found arguable probable cause to arrest

---

[5] https://www.deadiversion.usdoj.gov/schedules/marijuana/m_extract_7350.html.

for drug offenses based on much less.  *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 152, 157–58 (2d Cir. 2013).

In *Gonzalez*, the arrestee had said to a confidential informant, "What do you need? I can get you whatever you need," in an area known for drug activity.  *Id.* at 152.  The Second Circuit held that the arresting officers had lacked probable cause to arrest for drug possession or other drug offenses based on this statement.  *Id.* at 156–57.  Nevertheless, the officers had arguable probable cause and thus were not liable for Section 1983 false arrest.  *Id.* at 158.  The Second Circuit explained that "[w]hile [the plaintiff's] statement on its own d[id] not satisfy the elements of any crime," the officers could not have been "expected to undertake" a "close examination of the elements of a number of different criminal statutes" while making a "moment-to-moment" arrest decision.  *Id.* at 157.

Here, Philbin and Rittenhouse were not expected to undertake a close reading of complex federal and state guidance concerning whether a CBD vaporizer could have been legal in June of 2018, given the strong likelihood that it was not.  Cagan's false arrest claims thus cannot surmount qualified immunity.[6]

---

[6] Cagan conclusorily argues that Rittenhouse and Philbin would not have had arguable probable cause based on Cagan's earlier admission to CBD possession by the time Cagan was actually taken into custody, the day after Rittenhouse's drug test.  Pl.'s Mem. Opp. Rittenhouse Mot. 2, ECF No. 65-4.  This is irrelevant; Philbin and Rittenhouse were not present at Cagan's ultimate arrest by the VFPD.  Am. Compl. ¶ 63.  To the extent Philbin and

2.   <u>Malicious Prosecution</u>

Rittenhouse and Philbin also move to dismiss Cagan's Section 1983 malicious prosecution claim.  In addition to Section 1983's state action requirement, the elements of this malicious prosecution claim are derived from applicable state law.  *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013). Under New York law, those elements are: (1) commencement of a criminal proceeding, (2) favorable termination of the proceeding, (3) lack of probable cause, and (4) institution of the proceedings with actual malice.  *Id.* at 111-12.

To "commence" a prosecution for these purposes, "the mere reporting of a crime to police and giving testimony are insufficient; it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act."  *Rahman v. N.Y.C. Transit Auth. (NYCTA)*, 215 F.3d 208, 217 (2d Cir. 2000).  This standard may be satisfied where, for example, the defendant knew incriminating information about the plaintiff "to be false, yet still gave it to the police."  *Estiverne v. Esernio-Jenssen*, 581 F. Supp. 2d 335, 348 (E.D.N.Y. 2008).  This, of course, is precisely what Philbin and Rittenhouse are alleged to have done.

---

Rittenhouse would be liable for false arrest, it would be because Rittenhouse pressed charges — the same day as his drug test, at which time there was arguable probable cause for Cagan's arrest.

Additionally, "to be actionable under section 1983 there must be a post-arraignment seizure, the claim being grounded ultimately on the Fourth Amendment's prohibition of unreasonable seizures." *Swartz*, 704 F.3d at 112.

Cagan's malicious prosecution claim must be dismissed for two reasons: first, that (once again) he cannot allege that Rittenhouse and Philbin acted under color of state law; and second, that he has not alleged that the charges against him have actually been dismissed.

Regarding state action, as with the Section 1983 false arrest claim, there is no allegation that the role Rittenhouse and Philbin played in Cagan's prosecution in Nassau County was beyond the capability of ordinary citizens to play.  The Section 1983 malicious prosecution claim thus fails, as any malicious prosecution by these defendants was not under color of state law.

Separately, Cagan has failed to allege favorable termination of his criminal proceedings.  He states (in conclusory fashion) that his "prosecution terminated" when he agreed to an ACD on January 2, 2019.  Am. Compl. ¶ 77.  However, even if a dismissal pursuant to an ACD may be a favorable termination for these purposes, Cagan has alleged only the ACD, not the ensuing dismissal.  "When a defendant accepts an ACD in New York state court, . . . the government retains the right to

move to restore the case to the calendar" by "a motion within
six months — or in some cases one year — after the defendant
accepts the ACD." *Smalls v. Collins*, 10 F.4th 117, 142 (2d Cir.
2021) (citing N.Y. Crim. Proc. Law § 170.55(2)). "If the
government does not move within the prescribed time period, the
accusatory instrument is, at the expiration of such period,
deemed to have been dismissed by the court in furtherance of
justice and the arrest and prosecution shall be deemed a
nullity." *Id.* (citing N.Y. Crim. Proc. Law § 170.55(2) and
(8)). In short, dismissal after an ACD depends on whether "the
defendant behaved himself." *Singleton v. City of N.Y.*, 632 F.2d
185, 194 (2d Cir. 1980).

Here, Cagan expressly alleges that the state has *not*
dismissed charges against him. *Id.* ¶ 30 ("Plaintiff is
presently seeking to have his ACD disposition vacated and,
thereafter, have the charges dismissed . . . ."). Cagan filed
the amended complaint containing this allegation more than three
years after accepting the ACD, and he has not amended it in the
two years since. This allegation is inconsistent with favorable
termination. *See, e.g.*, *Price v. City of N.Y.*, No. 15-CV-5871,
2018 WL 3117507, at *9 n.10 (S.D.N.Y. June 25, 2018) ("Plaintiff
alleges that her criminal charge remained pending for almost six
years after her initial appearance in criminal court. This

suggests that the final disposition was not an ACD.").  Cagan has thus failed to plausibly allege favorable termination.

The malicious prosecution claims against Cagan and Rittenhouse are dismissed.

**B.   New York City's Motion to Dismiss**

The City moves to dismiss all claims against it. Under *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978), to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove, among other things, that a "municipal policy of some nature caused a constitutional tort." *Roe v. City of Waterbury*, 542 F.3d 31, 38 (2d Cir. 2008).  "In other words, a municipality may not be found liable simply because one of its employees committed a tort." *Id.*  Rather, a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the alleged injury. *Id.* at 37.

In addition to official policy, a plaintiff can satisfy *Monell* by pleading "sufficient instances of tolerant awareness by supervisors of abusive conduct." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 298 (2d Cir. 2020).  This will permit the "inference that they had a policy, custom or usage of acquiescence in such abuse." *Id.*

Cagan's *Monell* claims against the City fail because of — at least — his failure to allege that an official policy caused a violation of Cagan's rights.  Cagan points to one ostensible city-wide policy in support of his *Monell* claim: the myriad "systemic flaws" in the City's "police misconduct review process."  Am. Compl. ¶ 86.  Cagan posits that these flaws in the City's review process have created a "custom" of the City's "tolerat[ing] the improper and illegal arrests and other wrongful actions by its police officers."  *Id.* ¶ 85.  Cagan contends that this "led to the Individual Defendants having the belief that they can act without consequence causing the deprivation of Plaintiff's Constitutional Rights."  Pl.'s Mem. Opp. City Mot. 6, ECF No. 62.

Cagan does not adequately allege that the City has a policy of "acquiescence" in conduct like Philbin's or Rittenhouse's.  While "the persistent failure to discipline subordinates who violate civil rights" may constitute a policy of acquiescence in constitutional violations, *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983), no such persistence is alleged here.  The complaint is devoid of allegations that, besides Rittenhouse and Philbin on this one occasion, any NYPD officers have filed false criminal charges in other jurisdictions to protect their NYPD employment — much less that the City has tolerated their doing so.

Cagan's allegations also fail to establish *Monell* liability based on "the specific acts" of City officials.  *City of Waterbury*, 542 F.3d at 39–40.  Because liability on this ground would "hold a municipality liable for a single decision" by a pair of "municipal policymaker[s]," Cagan must plausibly allege that Philbin and Rittenhouse were "act[ing] in accordance with the responsibility delegated [them] under state law for making policy" for the City.  *Id.* at 41.  At most, as to any responsibility the City delegated to Philbin and Rittenhouse as police officers, they allegedly "misuse[d] [their] power to advance a purely personal agenda."  *Id.*  The City cannot be held liable for those acts.  *See id.*[7]

All claims against New York City are dismissed.[8]

_____

[7] Count 7 of the complaint — labeled "*Monell*" — is dismissed in its entirety, including as to non-moving defendants.  "*Monell* does not provide an independent separate cause of action against a municipality; 'it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Gem Fin. Serv., Inc. v. City of N.Y.*, 298 F. Supp. 3d 464, 490 (E.D.N.Y. 2018) (citing *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006)).

[8] Rittenhouse's counsel did not appear for two consecutive court proceedings: an August 11, 2022 pre-motion conference concerning, among other motions, Rittenhouse's own proposed motion to dismiss; and then the August 10, 2023 oral argument on the same.  In both cases, the court's Case Manager attempted to contact Rittenhouse's attorney of record, and in both cases, the attorney of record identified on the court's electronic docket, insisted he had no role in this case.  Rather, the court was told, Rittenhouse's counsel was his son, an attorney whose appearance was not reflected on the docket — and who, like his father, did not appear at either conference.

On August 17, the court ordered both attorneys to "show cause why sanctions should not issue for the missed court appearances."  ECF No. 76.  In light of counsel's letters, ECF Nos. 77–78, the court will not order sanctions.

## IV.  Conclusion

The motions to dismiss are granted.  The claims for false arrest and malicious prosecution under Section 1983 are dismissed against defendants Rittenhouse and Philbin.  The complaint is dismissed in its entirety as to the City.  Count 7 is also dismissed as to all defendants.

This dismissal is without prejudice to replead if Cagan can allege facts sufficient to cure the defects discussed herein.  Cagan may file an amended complaint within thirty days of the date of this order.  If the complaint is amended for the sole purpose of curing the defects at issue, Cagan need not move for leave to amend, and may simply provide the proposed amended complaint and a blackline in his filing, in accordance with this court's individual rules and practices.  If no such amendment is forthcoming in the time allotted, the claims addressed herein shall be dismissed with prejudice.

In addition, Cagan shall file a status report within 14 days of this order indicating whether he is continuing to

assert claims against any John Doe defendants who have not been
identified.


        SO ORDERED.



                                __/s/ Eric Komitee_____
                                ERIC KOMITEE
                                United States District Judge


Dated:      March 29, 2024
            Brooklyn, New York