UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
TOD S. CAGAN,

                          Plaintiff,

                                                              **MEMORANDUM**
          v.                                                  **AND ORDER**
                                                              22-CV-0260-SJB-LGD

INCORPORATED VILLAGE OF FREEPORT,
et al.,

                          Defendants.
-----------------------------------------------------------------X
**BULSARA, United States District Judge:**

This case arises out of Plaintiff Tod S. Cagan's arrest and prosecution for

allegedly assaulting Gregory Rittenhouse ("Rittenhouse"), an officer of the New York

City Police Department ("NYPD").  Following an evening out on the Nautical Mile in

Freeport with his then-girlfriend Dale Gaylor, Cagan gave his neighbor, NYPD Officer

Michael Philbin ("Philbin"), and Philbin's friend Rittenhouse a ride back home on his

boat.  Upon return, they went into Cagan's house.  Rittenhouse alleged Cagan offered

him a vape and misrepresented that it contained only nicotine, when it in fact contained

marijuana; Rittenhouse smoked the vape and immediately felt sick.  Rittenhouse then

filed a criminal complaint with the Village of Freeport Police Department ("VFPD")

against Cagan after being treated at the hospital, and Cagan was arrested for and

charged with assault in the second degree in violation of New York Penal Law

§ 120.05(5).  Cagan, however, contends that he never gave Rittenhouse a vape, and that

Rittenhouse only entered his home to use the bathroom.  After Philbin told a VFPD

officer that Rittenhouse received the vape from a stranger, Rittenhouse—fearing the loss

of his employment with the NYPD—concocted the false story which he recounted in a criminal complaint he filed to blame Cagan.

Cagan's Third Amended Complaint ("TAC") asserts claims for false arrest, malicious prosecution, *Brady* violations, fabrication of evidence, abuse of process, and failure to intervene, and names as Defendants the Incorporated Village of Freeport, the VFPD; Village of Freeport Detective Gene H. Hall Jr.; Village of Freeport Police Officers Lawrence K. Horne, Kennedy, Vincent Falzone, and Michael Geniale; Nassau County; the Nassau County District Attorney's Office; and Nassau County District Attorneys Madeline Singas and Anne T. Donnelly.  (TAC dated Jan. 29, 2025, Dkt. No. 114 ¶¶ 7–17, 88–179).  The Village of Freeport, the VFPD, and VFPD Officers Hall, Horne, Kennedy, Falzone, and Geniale, (collectively, "Defendants")[1] have moved for summary judgment on all claims.  (Defs.' Mot. for Summ J. dated Oct. 10, 2025 ("Defs.' Mot"), Dkt. No. 128-14).  For the reasons explained below, Defendants' motion is granted in part and denied in part.

LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury

---

[1] Cagan's claims against Nassau County, the Nassau County District Attorney's Office, and Nassau County District Attorneys Madeline Singas and Anne T. Donnelly remain pending, as they did not timely serve a motion for summary judgment.  (*See* Order dated Jan. 1, 2026).  Accordingly, when the Court refers to "Defendants" in this order, it is referring to the Freeport Defendants only.

could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party."  *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways.  Fed. R. Civ. P. 56(c)(1).  It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials."  *Id.* R. 56(c)(1)(A).  Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *Id.* R. 56(c)(1)(B); *cf. Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion, litigants are required by the Local Rules to provide a statement (a Rule 56.1 statement) setting forth purported undisputed facts or, if controverting any fact, responding to each assertion.  *See* Loc. Civ. R. 56.1(a)–(b).  In both instances, the party must support its position by citing to admissible evidence from the record.  *Id.* R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact).  "The purpose of Local Rule 56.1 is to streamline the

consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims. *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). Furthermore, "[l]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded." *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)). The court may not grant summary judgment based on a fact in a Rule 56.1 statement—even if undisputed—not supported by admissible evidence. *E.g., Giannullo v. City of New York*, 322 F.3d 139, 142–43 (2d Cir. 2003) (vacating grant of summary judgment to defendants based on facts enumerated in

Rule 56.1 statement supported only by arguments in briefs rather than admissible evidence).

The Court must also disregard conclusory denials that lack citations to admissible evidence. *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions[.]*"), *aff'd*, 56 F. App'x 27, 29 (2d Cir. 2003). Also, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Loc. Civ. R. 56.1(c). The Court also does not give any consideration to hearsay, speculation, or inadmissible evidence in evaluating declarations or affidavits. *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) ("[A] court is obliged not to consider inadmissible evidence at the summary judgment stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) ("[A] non-moving party 'must set forth specific facts showing that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139, 143 (2d Cir. 2009).

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court finds the following facts—drawn from the pleadings, the parties' respective Rule 56.1 statements, and supporting affidavits and exhibits attached thereto—are undisputed unless otherwise noted.

On June 15, 2018, Cagan and his then-girlfriend, Dale Gaylor, planned to take his boat to go to a restaurant, Bracco's Clam Bar, on the Nautical Mile in Freeport, New York. (Defs.' Rule 56.1 Statement dated Oct. 10, 2025 ("Defs.' 56.1 Stmt."), Dkt. No. 128-13 ¶¶ 21–22; Pl.'s Rule 56.1 Statement dated Dec. 26, 2025 ("Pl.'s 56.1 Stmt."), Dkt. No. 128-22 ¶¶ 21–22). Cagan's neighbor, NYPD Officer Michael Philbin, asked to join so he could meet a friend. (Pl.'s Rule 56.1 Counter-Statement of Additional Material Facts dated Dec. 26, 2025 ("Pl.'s 56.1 Counter-Statement"), Dkt. No. 128-22 ¶¶ 3, 5).[2] Upon arrival, all three of them (Cagan, Gaylor, and Philbin) walked over to Hudson's, another restaurant on the Nautical Mile. (Defs.' 56.1 Stmt. ¶ 23; Pl.'s 56.1 Stmt. ¶ 23). After spending about 30 minutes at Hudson's, Cagan and Gaylor left and went to Bracco's. (*Id.* ¶ 24; Defs.' 56.1 Stmt. ¶ 24). Philbin remained at Hudson's with his friend, Gregory Rittenhouse, an NYPD officer, and others, until Philbin and Rittenhouse left with

---

[2] Defendants did not respond to Cagan's counterstatement of additional material facts, so the Court deems those facts admitted where they are supported by record evidence. *See, e.g.*, *Okeke v. N.Y. & Presbyterian Hosp.*, No. 16-CV-0570, 2017 WL 1536060, at *1 (S.D.N.Y. Apr. 24, 2017) ("[O]nce the nonmoving party has put material facts into dispute via its additional 56.1 statement, the moving party must rebut them in order for the Court to grant summary judgment in its favor."); *Marseille v. Nat'l Freight Inc.*, No. 15-CV-7924, 2018 WL 2041387, at *1 n.1 (S.D.N.Y. Apr. 30, 2018) ("[B]ecause Plaintiff has failed to respond to Defendant's counterstatement of additional material facts, the Court may deem those facts admitted so long as they are supported by the record evidence.").

another individual and went to Jeremy's Ale House.  (*Id.* ¶ 25; Pl.'s 56.1 Stmt. ¶ 25).

Later that night, Cagan and Gaylor went to Jeremy's Ale House, and Philbin and

Rittenhouse approached them and asked for a ride back on Cagan's boat.  (*Id.* ¶ 26;

Defs.' 56.1 Stmt. ¶ 26).  Cagan gave them a ride back on his boat, and then all four of

them (Cagan, Gaylor, Philbin, and Rittenhouse) went into Cagan's home.  (*Id.* ¶¶ 27, 29;

Pl.'s 56.1 Stmt. ¶¶ 27, 29).

The parties dispute much of what happened next.  Defendants contend that the

group was sitting around Cagan's kitchen table, when Rittenhouse said he was going

outside to smoke a cigarette, and Cagan offered him a vape.  (Defs.' 56.1 Stmt. ¶¶ 30–

31).  Cagan allegedly reassured Rittenhouse that the vape only contained nicotine, and

Rittenhouse then smoked the vape and "immediately felt lightheaded, nauseous, and a

tingling sensation on his skin."  (*Id.* ¶¶ 32–33).  Rittenhouse "went to the bathroom,

splashed water on his face, attempted to vomit, and left the bathroom looking visibly

ill," and then stated he wanted to go to the hospital, to which Cagan responded that

"the vape contained THC and that he would be fine."  (*Id.* ¶¶ 34–35).

Cagan disputes all of this—he maintains that he never offered Rittenhouse a

vape and Rittenhouse never used his vape.  (Pl.'s 56.1 Stmt. ¶¶ 32–35).  Rather, Cagan

contends that Rittenhouse only came to his house to use the bathroom, went into the

bathroom immediately, and he never offered Rittenhouse a vape.  (*Id.* ¶¶ 29–30; Pl.'s

56.1 Counter-Statement ¶¶ 10–11).  Cagan contends that after Rittenhouse left the

bathroom, Cagan went into the bathroom and found urine and vomit.  (Pl.'s 56.1

Counter-Statement ¶ 12).  He proceeded to clean up, and when he exited "Rittenhouse

started screaming about the vape pen, asking what's in the vape pen" and that "when [Cagan] told Rittenhouse it was a CBD pen, Rittenhouse asked Philbin to call 911." (*Id.* ¶¶ 13–15).

Philbin then contacted VFPD Officer Michael Geniale ("Geniale"), his former co-worker at the NYPD, and asked him to come over. (*Id.* ¶ 16; June 21, 2024 Dep. of Michael Geniale ("2024 Geniale Dep."), attached to Pl.'s Opp'n as Ex. 2, Dkt. No. 128-17 at 17:13–18:5). When Geniale arrived, Philbin told Geniale that "a stranger" gave Rittenhouse a vape pen with CBD "in a bathroom somewhere on the Nautical Mile." (2024 Geniale Dep. at 20:10-15; Pl.'s 56.1 Counter-Statement ¶ 17). Geniale contacted his supervisor who told him to tell Philbin and Rittenhouse to call 911, request an ambulance, and go to the hospital. (Defs.' 56.1 Stmt. ¶ 37; Pl.'s 56.1 Stmt. ¶ 37). Geniale left, and Philbin called 911. (*Id.* ¶ 38; Defs.' 56.1 Stmt. ¶ 38; Pl.'s 56.1 Counter-Statement ¶ 19). In response, VFPD Officer Vincent Falzone ("Falzone") and an ambulance arrived on the scene, and transported Rittenhouse to the hospital. (Defs.' 56.1 Stmt. ¶ 38; Pl.'s 56.1 Stmt. ¶ 38). Falzone created a report on the scene or shortly thereafter, which stated:

> Upon arrival, reporting officer spoke with the aided, Gregory [Rittenhouse], who states he was at a bar and inhaled a puff of a Vaporizer pen that belonged to a stranger and is having some sort of reaction which [h]e believes is related to the pen. [Rittenhouse] states he did not know the person who offered him the Vaporizer Pen. [Rittenhouse] states he smoked a puff of the vaporizer pen and now is experiencing a[n] elevated heartbeat, dry mouth and his skin feels very 'weird'. [Rittenhouse] also states that he is feeling lightheaded. [Rittenhouse] requests to go to the hospital to be evaluated by a doctor. Reporting officer spoke with [Rittenhouse]'s friend, Michael [Philbin], who confirms the incident.

8

(Freeport Police Department Aided Report, attached to Defs.' Mot. as Ex. L, Dkt. No. 128-12; Defs.' 56.1 Stmt. ¶ 38; Pl.'s 56.1 Stmt. ¶ 38).

After Rittenhouse was treated at the hospital, he went to the Freeport Police Department with Philbin to file a criminal complaint. (*Id.* ¶ 39; Defs.' 56.1 Stmt. ¶ 39). VFPD Detective Gene Hall ("Hall") interviewed Rittenhouse and VFPD Officer Lawrence Horne ("Horne") interviewed Philbin; both Rittenhouse and Philbin said that Cagan gave the vape pen to Rittenhouse. (Pl.'s 56.1 Counter-Statement ¶ 23; Case Report, attached to Defs.' Mot. as Ex. I, Dkt. No. 128-9 at 20).[3] Hall tried to speak with Cagan the following day, and left his business card in Cagan's mailbox. (Defs.' 56.1 Stmt. ¶ 40; Pl.'s 56.1 Stmt. ¶ 40). He then contacted the Nassau County District Attorney's Office Early Case Assessment Bureau and was told that if he could articulate probable cause, then he could arrest Cagan. (*Id.* ¶ 41; Defs.' 56.1 Stmt. ¶ 41). Hall did not review the report prepared by Falzone, or discuss the incident with him, prior to Cagan's arrest. (*See* Pl.'s 56.1 Counter-Statement ¶ 25).

On June 17, 2018, VFPD Officers Hall, Horne, Kennedy, and Geniale arrested Cagan at his home. (Defs.' 56.1 Stmt. ¶ 42; Pl.'s 56.1 Stmt. ¶ 42). The next day Cagan was arraigned and charged with assault in the second degree in violation of New York Penal Law § 120.05(5), a class D felony, and was released on his own recognizance. (*Id.* ¶ 44; Defs.' 56.1 Stmt. ¶ 44; *see* TAC ¶¶ 59–62). Cagan later accepted an adjournment in

---

[3] Cagan's Rule 56.1 Statement alleges that Hall interviewed both Rittenhouse and Philbin, (Pl.'s 56.1 Counter-Statement ¶ 23), but the Report indicates that Horne interviewed Philbin, (*see* Case Report at 20).

contemplation of dismissal of his criminal charges on January 2, 2019.  (Defs.' 56.1 Stmt. ¶ 45; Pl.'s 56.1 Stmt. ¶ 45).

Cagan initiated this lawsuit on January 17, 2022.  (Compl. dated Jan. 17, 2022, Dkt. No. 1).[4]  He asserted claims under Section 1983 for false arrest, malicious prosecution, *Brady* violations, fabrication of evidence, abuse of process, and failure to intervene against the Defendants and Rittenhouse, Philbin, the City of New York, the NYPD, and VFPD Officers John Roe and Thomas L. Williams.  (Compl. ¶¶ 6–9, 18–19, 88–161; Am. Compl. dated Apr. 11, 2022, Dkt. No. 32 ¶¶ 6–19, 94–173).  The City of New York, Rittenhouse, and Philbin each moved to dismiss.  (*See* Mem. & Order dated Mar. 29, 2024, Dkt. No. 87 at 2).  The Court granted Rittenhouse and Philbin's motions to dismiss the false arrest and malicious prosecution claims because Cagan failed to allege that they were acting under color of state law, and Cagan's Complaint pled facts consistent with arguable probable cause.[5]  (*Id.* at 8, 15, 19).  And the Court granted New York City's motion to dismiss because Cagan failed to allege an official policy that caused a violation of his rights to sustain a *Monell* claim against the City.  (*Id.* at 22–23).  Cagan then filed his TAC on January 29, 2025, which dropped Rittenhouse, Philbin, the

---

[4] This case was transferred to the undersigned from the Honorable Eric R. Komitee on January 14, 2025.

[5] Judge Komitee found that Cagan pled facts consistent with arguable cause because "by [his] own allegations, he confessed to possessing CBD shortly before he was arrested," and it was unlawful to possess CBD under New York and federal law in June of 2018.  (Mem. & Order dated Mar. 29, 2024 at 15–16).  To the extent Defendants attempt to make this same argument for qualified immunity for the VFPD officers, it fails for the reasons discussed *infra*.

City of New York, the NYPD, Roe, and Williams as defendants.  The parties completed briefing on the Defendants' motion for summary judgment on January 12, 2026.

DISCUSSION

I.      **False Arrest**

"Under Section 1983, to establish a claim for false arrest, a plaintiff must show that the defendant intentionally confined him without his consent and without justification."  *Jin v. City of New York*, 169 F.4th 373, 380 (2d Cir. 2026) (quotation omitted).  "Actual probable cause is a complete defense to federal false arrest claims." *Sacaza v. City of New York*, 169 F.4th 363, 370 (2d Cir. 2026) (quotation omitted). "Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested."  *Jin*, 169 F.4th at 380 (quotation omitted).  In assessing probable cause to arrest, the Court focuses on "the facts available to the officer at the time of the arrest and immediately before it," and considers "the totality of the circumstances, reviewing plainly exculpatory evidence alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest."  *Sacaza*, 169 F.4th at 370 (quotation omitted).

Defendants rely upon facts and evidence not set forth in their Rule 56.1 statement to argue that the VFPD officers had probable cause, or arguable probable cause, to arrest Cagan.  For instance, Defendants contend in their motion papers that the officers relied upon "an admission statement from Plaintiff taken by Defendant Hall, [and] the HIP[AA] Form and hospital discharge report provided by Mr. Rittenhouse to

11

Defendant Hall," (Defs.' Mot. at 6), to conclude there was probable cause for Cagan's arrest.  None of these facts are set forth in Defendants' Rule 56.1 statement, and the Court does not consider them in deciding the motion.[6]  *See McGowan v. Stanley*, No. 23-7769, 2024 WL 5038633, at *2 (2d Cir. Dec. 9, 2024) ("[D]istrict courts are 'not required to consider what the parties fail to point out in their Local Rule 56.1 statements.'" (quoting *Holtz*, 258 F.3d at 73)).

But that is not the only defect.  Defendants' Rule 56.1 statement also contains assertions that are unsupported by the cited record evidence.  For instance, Defendants assert that Cagan "admitted to owning two vape pens, one of which was a CBD vape, when the officers were questioning [him] on the arrest date."  (Defs.' 56.1 Stmt. ¶ 43).  They cite to their Exhibit E—a portion of Cagan's January 5, 2024 deposition transcript—at "97 at 21," but Exhibit E starts on page 272 of the deposition transcript. (*See id.*; January 5, 2024 Dep. of Tod S. Cagan, attached to Defs.' Mot. as Ex. E., Dkt. No. 128-5).  Because this fact is unsupported by the evidence cited, the Court cannot and does not credit such unsupported facts.  *See Giannullo*, 322 F.3d at 142–43; *McGowan*, 2024 WL 5038633, at *2.

---

[6] Indeed, Defendants do not set forth *any* of the facts they allege provided the officers with probable cause to arrest Cagan in their Rule 56.1 statement, alleging only that "[a]fter being treated at the hospital, Philbin, Rittenhouse, and a PBA representative went to the Freeport Police Department to file a criminal complaint." (Defs.' 56.1 Stmt. ¶ 39).  It is only Cagan who indicates that Rittenhouse and Philbin stated that "[Cagan] had given the vape pen to Rittenhouse."  (Pl.'s 56.1 Counter-Statement ¶ 23).  Because these statements are part of the summary judgment record by virtue of Cagan introducing them, the Court considers them in resolving the motion.

Thus, Philbin and Rittenhouse's statements to Hall and Horne identifying Cagan as the person who gave Rittenhouse the vape were the sole basis for the officers' assessment that there was probable cause to arrest Cagan—and the Court analyzes Defendants' entitlement to qualified immunity on that basis alone, with the exception of Officer Falzone.[7]

Falzone was not present for Cagan's arrest, and Cagan fails to identify any evidence to suggest that Falzone "had reason to know that . . . a false arrest was likely to occur." *See Escalera v. Lunn*, 361 F.3d 737, 748 n.4 (2d Cir. 2004) ("[A] police officer can only be held liable for a false arrest that occurs outside of his presence if he 'had reason to know' that such a false arrest was likely to occur." (quotation omitted)). Accordingly, Falzone cannot be held liable for false arrest. *See, e.g.*, *id.*

*        *        *

"Even if probable cause is determined not to have existed, an arresting officer is entitled to qualified immunity if there was arguable probable cause for the arrest, which exists when, either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Jin*, 169 F.4th at 380–81 (quotation omitted). The arguable probable cause inquiry therefore asks "whether *any* reasonable officer, out

---

[7] While Judge Komitee's prior decision granting Rittenhouse and Philbin's motions to dismiss found that Cagan confessed to possessing CBD shortly before he was arrested, (Mem. & Order dated Mar. 29, 2024 at 15), Cagan only pled that he made this statement to Rittenhouse—before any VFPD officers arrived, (*see* Am. Compl. ¶ 49; TAC ¶ 44). Although the Court considers this fact in resolving the motion, it cannot provide an alternate factual basis for the VFPD officers to establish probable cause, since the statement was made outside the presence of any VFPD officers.

of the wide range of reasonable people who enforce the laws in this country, *could have* determined that the challenged action was lawful." *Id.* at 381 (quotation omitted). Accordingly, "in the context of arguable probable cause, law enforcement officers must be granted qualified immunity if a reasonable jury *could* find that there was probable cause," *Sacaza*, 169 F.4th at 373, because "[i]f a reasonable jury *could* find probable cause, then so could a reasonable officer," *id.* at 371. That said, "[a]rguable probable cause should not be misunderstood to mean almost probable cause." *Walsh v. City of New York*, 742 F. App'x 557, 562 (2d Cir. 2018) (quoting *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016)). "If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Id.* (quoting *Dancy*, 843 F.3d at 107).

"Unless exculpatory evidence or circumstances that raise doubts as to the alleged victim's veracity arise, probable cause is present where a police officer relies on such victim's identification of the suspect and statement of the alleged crime." *Sacaza*, 169 F.4th at 370–71 (quotation omitted). While officers are "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest" once they have "a reasonable basis for believing there is probable cause," "an officer may not disregard plainly exculpatory evidence." *Jin*, 169 F.4th at 385 (quotation omitted); *see also Triolo v. Nassau County*, 24 F.4th 98, 107 (2d Cir. 2022) ("Faced with information that undermined the veracity of the alleged victims, Lee did not engage in further investigation to ensure the existence of probable cause. And although he had no duty

14

to seek it out, Lee was not free to disregard the plainly exculpatory evidence that was presented to him."). "[T]o dissipate arguable probable cause, the circumstances or facts casting doubt on a victim's veracity need to be such that *no* reasonable police officer could find that probable cause existed." *Sacaza*, 169 F.4th at 372.

Because probable cause to arrest, and entitlement to qualified immunity, are determined by looking to the information each officer possessed at the time of arrest, the Court addresses immunity for each officer separately. *See Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) ("The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed."); *e.g.*, *Kweller v. County of Broome*, No. 24-CV-1328, 2025 WL 2719897, at *23 (N.D.N.Y. Sep. 24, 2025) ("Because probable cause to arrest is determined by looking at the information each defendant possessed at the time of arrest, the Court will address Investigator Miller and ADA Congdon separately."), *reconsideration denied*, 2025 WL 3280745 (Nov. 25, 2025).

Officers Hall, Horne, and Kennedy had at least arguable probable cause to arrest Cagan, and are therefore entitled to qualified immunity. Hall interviewed Rittenhouse and Horne interviewed Philbin, and each reported that Cagan gave Rittenhouse a vape pen containing marijuana.[8] (*See* Apr. 19, 2024 Dep. of Gene Hall ("Hall Dep."), attached to Pl.'s Opp'n as Ex. 5, Dkt. No. 128-20 at 64:6-15; Case Report at 20). Hall, Horne, and

---

[8] The parties do not identify what Kennedy knew at the time of the arrest. But he was entitled to rely on Hall and Horne's probable cause determinations "[a]bsent significant indications to the contrary." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). And Cagan identifies none.

Kennedy were entitled to rely upon these statements as the basis for concluding probable cause existed, and to arrest Cagan. There is no evidence that any of them were aware of any exculpatory evidence or information casting doubt on Rittenhouse's veracity—such as Falzone's report, or the interaction between Rittenhouse, Philbin, and Geniale on the night of the incident—when they arrested Cagan.[9] *See Crawford v. City of New York*, 477 F. App'x 777, 779 (2d Cir. 2012) ("Because there were no circumstances that raise[d] doubts as to the victim[s]' veracity, their statements provided probable cause to arrest Crawford." (quotation omitted)); *e.g.*, *Ward v. United States*, No. 21-2648, 2022 WL 1509672, at *2 (2d Cir. May 13, 2022) ("Based on Bamba's victim statement, probable cause exist[ed], unless the circumstances raise[d] doubt as to [Bamba's] veracity. While Ward alleges that . . . NYPD officers were aware of Bamba's history of false allegations against colleagues, the complaint does not allege that Familo, a federal agent, was aware of these facts." (quotation and citation omitted)); *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 390 (S.D.N.Y. 2008) ("Parrello could rely on Gierszewski's complaint because he had no reason at the time to doubt the veracity of her statement[.]"). Because there is no evidence that Hall, Horne, or Kennedy had knowledge of facts casting doubt upon Rittenhouse's veracity, it cannot be said that

---

[9] Cagan contends that Geniale testified that "he may have made sure that Detective Hall knew" there was a report on the case, namely Falzone's report. (Pl.'s 56.1 Counterstatement ¶ 28 (citing 2021 Geniale Dep. at 34:25–35:11)). But Geniale only said this in response to a question regarding conversations he may have had with Hall *after Cagan's arrest*, (*see id.* at 34:19-22 ("After the arrest and you transport Mr. Cagan to the precinct, do you have any conversations after that with Detective Hall?")). Therefore, even if true, this fact is irrelevant to the determination of whether Hall had probable cause at the time of Cagan's arrest.

they "disregard[ed] plainly exculpatory evidence." *Jin*, 169 F.4th at 385.  While it may have been "the better procedure," for them to investigate further before effectuating Cagan's arrest, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Id.*  Accordingly, Hall, Horne, and Kennedy are entitled to qualified immunity on the false arrest claim.

Unlike Hall, Horne, and Kennedy, Geniale possessed information raising significant doubts as to Rittenhouse's veracity.  The night of the incident, Philbin told Geniale that the vape was given to Rittenhouse "by a stranger in a bathroom somewhere on the Nautical Mile." (2024 Geniale Dep. at 20:10-15, 30:11-17).  This statement, made shortly after Rittenhouse began to feel sick, plainly contradicts the statements Rittenhouse and Philbin later gave.  And not only that, it is plainly exculpatory evidence.  If true, Philbin's statement to Geniale that Rittenhouse was given the vape by "a stranger in a bathroom somewhere on the Nautical Mile" — not by Cagan, his neighbor — indicates that Cagan had zero involvement in the incident.  In such circumstances, courts have found that no reasonable officer could conclude there was probable cause to arrest based on a victim's statement alone.

For example, in *Stora v. City of New York*, the plaintiff brought a false arrest claim, alleging that an NYPD officer arrested him for burglary based on solely on statements of the alleged victims, despite substantial evidence indicating that he resided at the apartment allegedly burglarized.  No. 16-CV-4541, 2019 WL 1746955, at *2 (E.D.N.Y. Apr. 18, 2019).  The court found "neither probable cause nor arguable probable cause to

17

arrest [the plaintiff] existed at the time of the arrest," finding no reasonable officer could conclude probable cause existed in light of "the amount of exculpatory evidence"—including the fact that "the officers at the scene of the alleged burglary believed [the plaintiff] to be a resident of the home and refused to arrest him, and that [the plaintiff] protested to [the arresting officer] that he resided there." *Id.* at \*4.

On these facts, as in *Stora*, it would be plain to any reasonable officer that the statements Rittenhouse and Philbin gave Hall and Horne did not amount to "knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed *by the person to be arrested*." *Jin*, 169 F.4th at 380 (emphasis added) (quotation omitted); *Stora*, 2019 WL 1746955, at \*4.[10]  While the arguable probable cause standard is more forgiving than the probable cause inquiry, "[a]rguable probable cause should not be misunderstood to mean almost probable

---

[10] Although it does not bear on the absence of arguable probable cause or the objective reasonableness of his conduct, *see Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015), Geniale plainly did not believe Rittenhouse and Philbin's narrative blaming Cagan. Geniale told Cagan that he "was there that night" and "[he] just felt like the story was inconsistent." (Sep. 21, 2021 Dep. of Michael Geniale ("2021 Geniale Dep."), attached to Pl.'s Opp'n as Ex. 6, Dkt. No. 128-21 at 28:3-9; Pl.'s 56.1 Counter-Statement ¶ 29).  And according to Cagan, Geniale told him that he should have Rittenhouse and Philbin—"those two clowns"—"investigated." (Dec. 11, 2023 Dep. of Tod S. Cagan, attached to Pl.'s Opp'n as Ex. 1, Dkt. No. 128-16 at 190:6-18; Pl.'s 56.1 Counter-Statement ¶ 30). *See, e.g., Foster v. Diop*, No. 11-CV-4731, 2013 WL 1339408, at \*12 (E.D.N.Y. Mar. 31, 2013) ("[A]ssuming the truth of plaintiff's allegations, it would be objectively unreasonable for Dickerson to believe she had probable cause to arrest plaintiff if, as plaintiff alleges, Dickerson knew that the primary bases for executing plaintiff's arrest—Diop's accusations—were false, unreliable, or questionable.  It is well established that 'no reasonably competent [ ] officers could disagree . . . that a parole officer cannot properly rely on evidence he knows to be false.'" (quoting *Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998)).

cause." *Walsh*, 742 F. App'x at 562 (quotation omitted).  Here, "officers of reasonable competence would have to agree that the information possessed by [Geniale] at the time of arrest did not add up to probable cause." *Id.* (quotation omitted).  Knowing that Philbin initially alleged that Rittenhouse was given a vape in a bathroom somewhere on the Nautical Mile, rather than in Cagan's house, and by a "stranger"—not Cagan—no reasonable officer could conclude that Rittenhouse and Philbin's later statements to Hall and Horne, standing alone, provided probable cause to arrest Cagan.

Inconsistencies do not necessarily negate arguable probable cause, including where the inconsistencies are minor or there is other corroborating evidence to support probable cause.  For instance, in *Sacaza*, the Second Circuit held that an arresting officer was entitled to qualified immunity where video footage "both corroborate[d] and contradict[ed] parts of the Complainant's statements to the NYPD" and found that "a reasonable police officer could have found the inconsistencies [in the Complainant's statements] did not undermine the veracity" of a victim's complaint.  169 F.4th at 372. And in *Triolo*, the Second Circuit held that an officer was entitled to qualified immunity based on arguable probable cause despite the fact that he "ignored exculpatory evidence and information that undermined the veracity of the alleged victims," finding it was not clear "that *no* reasonable officer could have believed that probable cause existed."  24 F.4th at 108.

The inconsistences presented here are not, however, minor, and there is no additional corroborating evidence that could support a finding of arguable probable cause.  Philbin gave Geniale a version of events flatly inconsistent with the version he

19

later gave, one which exculpated Cagan by identifying someone else as the individual who committed the alleged crime. This is a far cry from the circumstances presented in *Sacaza* and *Triolo*. Unlike in *Sacaza*, where "MTA footage and other information provided objective evidence for a reasonable police officer to arrest and charge Sacaza," 169 F.4th at 371, Rittenhouse and Philbin's statements to Hall and Horne—which were flatly inconsistent with Philbin's statement from a few hours earlier—provided the entire basis for Geniale to participate in Cagan's arrest, *see supra* pp. 11–13. There is no additional evidence or corroboration that would permit the Court to conclude that the exculpatory evidence Geniale knew of at the time of Cagan's arrest did not negate arguable probable cause.

*Triolo* is also distinguishable. In holding that the officer had arguable probable cause, the Second Circuit found that the victims' accounts were consistent with one another's, and although "the lack of visible injuries arguably undermined their veracity," it was "nonetheless possible that no visible injuries resulted from the alleged assault." *Triolo*, 24 F.4th at 108. And while the domestic incident report stated "no offense [was] committed," "a reasonable officer receiving this report could have concluded this was a mistake because the form also plainly indicated that Triolo had engaged in punching, pushing, strangulation, and choking." *Id.* That situation—one where all the evidence, including the possibly exculpatory, could be harmonized—is not the one here. The two narratives presented to Geniale were completely irreconcilable.

In the absence of any corroborating evidence or additional investigation, it would be objectively unreasonable for any officer to simply choose to believe Rittenhouse and Philbin's later statements over Philbin's earlier one—without any factual basis for that choice—and completely ignore Philbin's plainly exculpatory statement. *See Parisi v. Suffolk County*, No. 04-CV-2187, 2009 WL 4405488, at *7 (E.D.N.Y. Nov. 30, 2009) ("[A] police officer does not have *carte blanche* to neglect all investigative duties in relying on a victim statement; the officer can only derive probable cause to effect an arrest from that statement absent circumstances that raise doubts as to the victim's veracity." (quotation omitted)); *Pearson v. Lorancaitis*, No. 09-CV-1641, 2012 WL 162355, at *9 (D. Conn. Jan. 19, 2012) ("Where a victim's veracity has been called into question, courts have not require[d] that the victim's statement be wholly ignored, but that the police have additional information to buttress the victim's statement." (quotation omitted)) (collecting cases). Accordingly, because no reasonable officer could conclude that there was arguable probable cause to arrest Cagan based on the facts known by Geniale, Geniale is not entitled to qualified immunity.[11]

---

[11] The "right to be free from arrest without probable cause" is a "clearly established right[] that justif[ies] the denial of qualified immunity." *Soukaneh v. Andrzejewski*, 112 F.4th 107, 124 (2d Cir. 2024). And Defendants advance no argument to the contrary.

In sum, the Court grants the motion for summary judgment on the false arrest claim as to Falzone, Hall, Horne, and Kennedy, and denies the motion as to Geniale.[12]

## II.   Malicious Prosecution

"To prevail on a malicious-prosecution claim under section 1983, a plaintiff must establish '(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding,' '(4) actual malice,' and '(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'" *Stollman v. Williams*, No. 23-7610, 2025 WL 2784215, at *4 (2d Cir. Sep. 30, 2025) (quoting *Alexander v. City of Syracuse*, 132 F.4th 129, 158 (2d Cir. 2025)).  As with false arrest, "probable cause is a complete defense to a malicious prosecution claim." *Alberty v. Hunter*, 144 F.4th 408, 418 (2d Cir. 2025) (quotation omitted).  "Where officers have probable cause for an arrest, they will also have

_____

[12] In their motion papers, Defendants emphasize that "there is nothing in the record to suggest that, at the time Defendant Hall took Mr. Rittenhouse's sworn statement, Defendant Hall had any reason to question the statement's veracity" and he was "the arresting officer." (Defs.' Mot. at 8).  But that does not immunize Geniale, who had information indicating that there was no probable cause to arrest Cagan and nonetheless personally participated in Cagan's arrest.  *See Panetta*, 460 F.3d at 395 (explaining that "an officer is entitled to rely on his fellow officer's determination that an arrest was lawful" only "[a]bsent significant indications to the contrary" (quotation omitted)).

To the extent Defendants contend that only Hall can be held liable for false arrest, that argument is meritless.  They cite no authority indicating that only a single "arresting officer" may be held liable for false arrest, and courts routinely hold multiple officers liable.  *See, e.g., Jackson v. Tellado*, 236 F. Supp. 3d 636, 650–51 (E.D.N.Y. 2017) (noting that the jury returned a verdict finding seven officers liable for plaintiff's false arrest).  And the fact that Hall is entitled to qualified immunity on the false arrest claim does not preclude the Court from concluding that Geniale is not, "[g]iven the difference in what the two . . . officers . . . knew or believed about the circumstances giving rise to the arrest." *Id.* at 658.

probable cause to prosecute, unless new facts emerge after the arrest, but before the prosecution, that demonstrate the charges are groundless." *Wekenmann v. Biegasiewicz*, No. 24-1181, 2025 WL 831201, at *4 (2d Cir. Mar. 17, 2025). And "even if actual probable cause does not exist to support a malicious prosecution claim, officers are entitled to qualified immunity if they had arguable probable cause at the time the prosecution was initiated." *Id.*

As to the first element, "[p]olice officers do not generally 'commence or continue' criminal proceedings against defendants, [but] a claim for malicious prosecution can still be maintained against a police officer if the officer is found to play[] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quotation omitted). This element may be satisfied by "showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Id.* As for Horne, Kennedy, and Geniale, Cagan does not set forth any evidence demonstrating they were involved in his prosecution—there is no indication that they communicated with the prosecutors at all following his arrest. And while all three participated in Cagan's arrest, that is insufficient to hold them liable for malicious prosecution. *See, e.g.*, *Best v. Merchant*, No. 21-CV-0779, 2026 WL 1328442, at *6 (S.D.N.Y. May 12, 2026) ("All defendants must be granted summary judgment on Mr. Best's malicious prosecution claim. The undisputed facts in the record establish that Defendants Negron or Acosta were not personally involved in the prosecution[.]"), *appeal docketed*, No. 26-1434 (2d Cir. May 26, 2026).

23

Only Hall communicated with the District Attorney's Office regarding Cagan's prosecution. (*See* Defs.' 56.1 Stmt. ¶ 41; Pl.'s 56.1 Stmt. ¶ 41). While Hall may have been involved in Cagan's prosecution, he is entitled to qualified immunity. As explained above, Hall had arguable probable cause to arrest Cagan, and Cagan has set forth no evidence indicating that Hall discovered information—such as Falzone's report—that may have dissipated arguable probable cause in the time between his arrest and prosecution. Accordingly, to the extent he participated in Cagan's prosecution, Hall is entitled to qualified immunity. *See, e.g.*, *Saunders v. Cavada*, 750 F. Supp. 3d 1, 4 (E.D.N.Y. 2024) (finding officer entitled to qualified immunity on malicious prosecution claim where he had arguable probable cause to arrest the plaintiff and the plaintiff did "not point[] to any information that arose after his arrest that would have nullified the probable cause"), *reconsideration denied*, No. 19-CV-3279, 2025 WL 2391759 (Aug. 18, 2025), *appeal docketed*, No. 24-2849 (2d Cir. Oct. 29, 2024).

### III.    *Brady* Violations

"Police officers can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors." *Jeanty v. Cerminaro*, No. 21-1974, 2023 WL 325012, at *4 (2d Cir. Jan. 20, 2023) (quoting *Bermudez*, 790 F.3d at 376 n.4). "A *Brady* violation has three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Id.* (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)). "[T]o show prejudice the claimant must demonstrate a reasonable probability that, had

24

the evidence been disclosed, the result of the proceeding would have been different."

*Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019) (quotation omitted).

Defendants contend that Cagan cannot satisfy the prejudice element required to prevail on a *Brady*-based Section 1983 claim because Cagan was not convicted—he accepted an adjournment in contemplation of dismissal of his criminal charges. (*See* Defs.' Mot. at 13–14; Defs.' 56.1 Stmt. ¶ 45; Pl.'s 56.1 Stmt. ¶ 45). The Court agrees—"the fact that suppression of *Brady* material could prevent a defendant from securing an earlier favorable termination of his or her case is not considered as a potential source of 'prejudice' within the meaning of the *Brady* rule." *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 472 (S.D.N.Y. 2009); *cf. Johnson v. N.Y.C. Police Dep't*, 651 F. App'x 58, 60 (2d Cir. 2016) ("'*Brady*-based § 1983 claims necessarily imply the invalidity of a challenged conviction in the trial (or plea) in which the *Brady* violation occurred' because 'the remedy for a *Brady* violation is vacatur of the judgment of conviction and a new trial.'" (quoting *Poventud v. City of New York*, 750 F.3d 121, 132–33 (2d Cir. 2014) (en banc))). "The *Brady* doctrine is meant to protect criminal defendants from unreliable convictions arising from unfair trials (or plea proceedings), and not from any other type of harm." *Ambrose*, 623 F. Supp. 2d at 472 (citing *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001)). Prejudice therefore requires a showing that "the result of the proceeding would have been different," *Bellamy*, 914 F.3d at 751 (quotation omitted), not merely that the proceedings would have terminated earlier. Because Cagan did not proceed to trial or enter a guilty plea—there was simply no judgment of conviction—he cannot demonstrate the prejudice required to sustain a *Brady* claim under Section 1983.

25

*McClean v. County of Westchester*, No. 17-CV-4492, 2018 WL 6329420, at \*18 (S.D.N.Y. Dec. 3, 2018) ("Courts have categorically rejected denial of a right to fair trial claims based on *Brady* violations where the plaintiff was not convicted in the underlying criminal trial."), *aff'd sub nom.*, *McClean v. City of Mount Vernon*, 776 F. App'x 725 (2d Cir. 2019); *see, e.g.*, *Hammer v. Town of Bedford*, No. 25-CV-2618, 2026 WL 100793, at \*22 (S.D.N.Y. Jan. 13, 2026) ("Plaintiff was not convicted, nor did she have a trial in either case, because both sets of charges were dismissed before trial.  Thus, Plaintiff cannot show either that [the Town Attorney], in prosecuting Plaintiff, had an obligation to disclose the alleged *Brady* material, or that Plaintiff was prejudiced by the failure to disclose it." (citation omitted)), *motion for relief from judgment denied*, 2026 WL 1008392 (Apr. 14, 2026), *appeal docketed*, No. 26-0162 (2d Cir. Jan 27, 2026).  Accordingly, Defendants' motion for summary judgment on Cagan's *Brady* claim is granted.

## IV.    Fabrication of Evidence

"In order to prevail on a Section 1983 fabrication of evidence claim, a plaintiff must demonstrate that (1) an investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Ortiz v. Stambach*, 137 F.4th 48, 67 (2d Cir. 2025) (cleaned up).  "The fabrication element requires . . . that the defendant knowingly make a false statement or omission." *Ashley v. City of New York*, 992 F.3d 128, 143 (2d Cir. 2021).  That is, a plaintiff must "prove that a defendant's use of inaccurate information was 'knowing, as opposed to mistaken.' Absent *scienter*, showing that the prosecution relied on false evidence is insufficient."

26

*Davis-Guider v. City of Troy*, No. 23-0589, 2024 WL 5199294, at *3 (2d Cir. Dec. 23, 2024) (quoting *Barnes v. City of New York*, 68 F.4th 123, 129 (2d Cir. 2023)) (citation omitted).

Cagan cannot maintain a fabrication of evidence claim against Hall, Horne, Kennedy, Geniale, or Falzone because he fails to set forth evidence that any of them "knowingly ma[de] a false statement or omission" in any of the evidence provided to prosecutors. *See Ashley*, 992 F.3d at 143; *Davis-Guider,* 2024 WL 5199294, at *3. Cagan alleges that the felony complaint filed against him, which was prepared by Hall, contained the following false information:

> On 6–17–18 at 0130 hrs, the complainant Gregory Rittenhouse was at 178B Sportsman, Ave., Freeport, NY. The defendant Tod Cagan did give the complainant a vape containing TH[C] (Tetrahydrocannabinol) without his consent. This caused the complainant to have nausea, dizziness and blurred vision.

(TAC ¶ 141). To the extent these statements may be fabricated, they were fabricated by Rittenhouse and Philbin—these statements are derived from the statements they gave to Hall and Horne when they went to the Freeport Police Department to file a complaint against Cagan. Cagan does not set forth any evidence indicating that Hall knew these statements were false when he prepared the felony complaint. That is fatal to his

27

fabrication of evidence claim.[13]  *See Davis-Guider*, 2024 WL 5199294, at *3 (affirming district court's grant of summary judgment on fabricated evidence claim where the plaintiff "adduced no evidence that Defendants *knowingly* fabricated evidence" (emphasis added)); *e.g.*, *Fowler-Washington v. City of New York*, No. 19-CV-6590, 2023 WL 2390538, at *7–*8 (E.D.N.Y. Mar. 7, 2023) (granting summary judgment where "Plaintiff presented no evidence that [the officer who prepared the complaint] knew that [the other officer's] statements regarding Plaintiff's resisting arrest were allegedly false"). Accordingly, the motion for summary judgment on the fabrication of evidence claim is granted.

## V.    Abuse of Process

To prevail on a claim for abuse of process under Section 1983, a plaintiff must prove that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act[,] (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process."  *Zappin v. Cooper*, No. 23-0165, 2024 WL 3084015, at *2 (2d Cir. June

---

[13] To the extent Cagan asserts that Horne, Kennedy, Geniale, and Falzone fabricated evidence, Cagan identifies no evidence allegedly fabricated by these Defendants in either his TAC or his Rule 56.1 Statement.  Cagan's conclusory assertion in his opposition that "Defendants ignored exculpatory evidence and created a fabricated . . . accusatory statement that led to the prosecution of Plaintiff," (Pl.'s Opp'n to Defs.' Mot. for Summ J. dated Dec. 26, 2025 ("Pl.'s Opp'n"), Dkt. No. 128-23 at 7), which contains no citation to record evidence, is insufficient to survive a motion for summary judgment.  *See, e.g.*, *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, at *16 (S.D.N.Y. Sep. 29, 2018) ("Conclusory statements that officers fabricated evidence do not suffice to state a claim for the denial of a fair trial.  Instead, plaintiffs must identify the actual fabrication." (citations omitted)) (collecting cases); *Smalls v. City of New York*, 181 F. Supp. 3d 178, 185–86 (E.D.N.Y. 2016) (dismissing plaintiff's fabrication of evidence claim against officers where plaintiff "fail[ed] to identify what, if any, fabricated evidence" they offered).

21, 2024) (quoting *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)) (noting that abuse of process elements are derived from elements under New York law).  "The crux of a malicious abuse of process claim is the collateral objective element," *Kraft v. City of New York*, 696 F. Supp. 2d 403, 416 (S.D.N.Y. 2010), *aff'd,* 441 F. App'x 24 (2d Cir. 2011), which requires a plaintiff to demonstrate that the defendant "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution," *Hernandez v. United States*, 939 F.3d 191, 204 (2d Cir. 2019) (quotation omitted).  "[A] malicious motive alone . . . does not give rise to a cause of action for abuse of process."  *Id.*

Cagan contends that Defendants abused the criminal process by initiating his prosecution to (1) "subject [Cagan] to punishment without just cause," (Pl.'s Opp'n to Defs.' Mot. for Summ J. dated Dec. 26, 2025 ("Pl.'s Opp'n"), Dkt. No. 128-23 at 8); (2) "satisfy their personal goals of covering up their wrongdoing and . . . further their own purposes of exercising their privilege for their own warped sense of power," (*id.*); and (3) "protect Rittenhouse," (TAC ¶ 125).  Cagan sets forth no evidence to support these allegations.

Even setting aside the lack of evidentiary support, Cagan's first two allegations—that Defendants commenced his prosecution to "subject [him] to punishment without just cause" and "to cover[] up their own wrongdoing and . . . further their own purposes of exercising their privilege for their own warped sense of power"—cannot satisfy the collateral objective requirement.  These allegations indicate only a potentially improper motive—not an improper "collateral purpose beyond or in addition to [Cagan's] criminal prosecution," *Hernandez*, 939 F.3d at 204—and have been held

29

insufficient to support an abuse of process claim even at the motion to dismiss stage, *e.g.*, *Johnson v. Town of Greece*, No. 25-CV-6261, 2026 WL 294961, at *6 (W.D.N.Y. Feb. 4, 2026) (dismissing abuse of process claim where plaintiff made similar allegations as here, finding that that they do "not constitute an improper purpose because Defendants are not alleged to have invoked the legal process to coerce Plaintiff into doing something other than what the process necessitates"); *Santiago v. City of Rome*, No. 24-CV-0704, 2025 WL 553347, at *8 (N.D.N.Y. Feb. 19, 2025) (finding that "[t]hese allegations of a 'cover up' do not satisfy the collateral objective requirement"); *see also Crews v. County of Nassau*, No. 06-CV-2610, 2007 WL 4591325, at *12 (E.D.N.Y. Dec. 27, 2007) ("Because plaintiffs have merely alleged that defendants were motivated by their desire to cover up their misdeeds, but not that defendants had a purpose other than to prosecute Crews, the abuse of process claim fails.").

Cagan's third allegation—that Defendants prosecuted him to "protect Rittenhouse"—is also insufficient. While "[f]abricating assault charges to save one's job could be abuse of process," *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009), Cagan sets forth no evidence indicating that Hall, Horne, Kennedy, Geniale, or Falzone commenced his prosecution in order to save Rittenhouse's job. None of them even knew Rittenhouse prior to the incident. At best, Cagan appears to argue that solidarity among police officers led the VFPD officers to commence his prosecution to protect the employment of a fellow officer with the NYPD, but this "speculation alone is insufficient to defeat a motion for summary judgment." *See Saeli v. Chautauqua County*, 36 F.4th 445, 454 (2d Cir. 2022) (quotation omitted). Because

30

Cagan has not demonstrated that "the arresting officers had a collateral purpose beyond his prosecution," *Barnes*, 68 F.4th at 128, the motion for summary judgment on the abuse of process claim is granted.

## VI.    Failure to Intervene

As to Cagan's failure to intervene claim, he abandoned this claim by failing to defend this claim in his opposition to Defendants' motion for summary judgment. "It is at the time of the motion for summary judgment that a party can decide which claim to pursue and which not." *Ruradan Corp. v. City of New York*, No. 22-CV-3074, 2024 WL 1555230, at *5 (S.D.N.Y. Apr. 10, 2024) (citing *Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014)). "Where a partial response to a motion [for summary judgment] is made—i.e., referencing some claims or defenses but not others . . . in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd*, 716 F. App'x 5, 14 (2d Cir. 2017) (quoting *Jackson*, 766 F.3d at 197–98); *see also Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (deeming claims abandoned where plaintiff "fail[ed] to argue that they should survive [defendant's] motion for summary judgment" while addressing other claims).

Here, Defendants moved for summary judgment on all of Cagan's claims, and specifically argued for dismissal of Cagan's failure to intervene claim. (Defs.' Mot. at 24–25). Cagan defends the rest of his claims in his opposition, but he "fail[s] to support or even address" the failure to intervene claim. *Kovaco*, 834 F.3d at 143. Accordingly,

the Court deems Cagan's failure to intervene claim abandoned, and grants Defendants'

motion for summary judgment on that claim.

**VII.    *Monell***

Under *Monell*, a municipality may be held liable under Section 1983 if the

deprivation of the plaintiff's constitutional rights "is caused by a governmental custom,

policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d

Cir. 2012). "While municipal liability may be established by demonstrating a formal,

officially adopted policy, liability may also attach through the decision of a final

policymaker or where a widespread practice is so permanent and well-settled as to

constitute a policy with force of law." *Falu v. County of Orange*, 814 F. App'x 655, 658

(2d Cir. 2020) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691,

694 (1978)). "Isolated acts of non-policymaking individuals may form the basis of

liability if 'they were done pursuant to municipal policy, or were sufficiently

widespread and persistent to support a finding that they constituted a custom, policy,

or usage' of which supervisors knew or should have known." *Id.* (quoting *Jones*, 691

F.3d at 81).

To the extent Cagan seeks to hold the Village of Freeport liable under *Monell*, he

fails to set forth any evidence that any violation of his constitutional rights was caused

by governmental custom, policy, or usage of the Village. Cagan alleges that "the

Freeport Police Department has a blanket policy of arresting based purely on the

statements of a complaining witness, as well as neglecting exculpatory evidence in an

attempt to protect its own officers." (Pl.'s Opp'n at 9). But Cagan has adduced no

evidence to demonstrate the existence of this formal or informal policy beyond his own arrest, which is insufficient to support a *Monell* claim. *See Cotto v. City of New York*, 803 F. App'x 500, 504 (2d Cir. 2020) ("Cotto's allegations do not support a *Monell* claim because they focus on the individual officers and isolated events leading to Cotto's stop, detention, and prosecution without plausibly alleging a custom or policy pursuant to which those violations occurred."); *e.g.*, *Cucuta v. New York City*, 25 F. Supp. 3d 400, 419 (S.D.N.Y. 2014) ("Cucuta's claim is nothing more than a rehashing of the events of April 13, 2011 couched as a policy with no supporting evidence. This showing is insufficient."); *Carmody v. Village of Rockville Ctr.*, 661 F. Supp. 2d 299, 331 (E.D.N.Y. 2009) ("A single, isolated incident . . . does not suffice to show a municipal custom. [F]or a plaintiff's claim of custom or policy to survive summary judgment review, there necessarily must be evidence of the complained-of activity by defendants in similar circumstances outside of the present case." (quotations and citations omitted)) (collecting cases) (adopting report and recommendation). Accordingly, Cagan's claims against the Village of Freeport are dismissed.[14]

CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment is granted in part and denied in part. The Court grants Defendants' motion for summary judgment on Cagan's claims for malicious prosecution, *Brady* violations, fabrication of

---

[14] Cagan also names the VFPD as a Defendant, but the VFPD is a non-suable entity. *See Jenkins*, 478 F.3d at 93 n.19 ("[T]he NYPD is a non-suable agency of the City."); *Henry v. County of Nassau*, 6 F.4th 324, 336 (2d Cir. 2021) ("[T]he Nassau County Police Department is a non-suable agency of Nassau County."). Cagan's claims against the VFPD are therefore dismissed. *E.g.*, *Harrison v. Inc. Village of Freeport*, 498 F. Supp. 3d 378, 400 (E.D.N.Y. 2020).

evidence, abuse of process, and failure to intervene.  In addition, the Court dismisses all claims against the Village of Freeport and the VFPD.

As to Cagan's claim for false arrest, the Court grants the motion for summary judgment as to Defendants Hall, Horne, Kennedy, and Falzone.  However, the Court denies summary judgment on this claim as to Defendant Geniale.  Because all claims against the Village of Freeport, the VFPD, Hall, Horne, Kennedy, Falzone are dismissed, the Clerk of Court is respectfully directed to remove these defendants from the docket. The remaining parties are directed to submit a joint proposed pretrial order by **July 30, 2026**, consistent with the undersigned's Individual Practices.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date:   June 30, 2026
        Central Islip, New York

34